In the Matter of the DEPARTMENT OF DEFENSE CABLE TELEVISION FRANCHISE AGREEMENTS.

National Defense Authorization Act for Fiscal Year 1996—Section 823.

No. 96–133X.

United States Court of Federal Claims.

July 11, 1996.

## REPORT TO CONGRESS

SMITH, Chief Judge.

### I. PROCEDURAL HISTORY

Section 823 of the National Defense Authorization Act for Fiscal Year 1996, Pub.L. No. 104–106, 110 Stat. 186 (1996), has requested that the Chief Judge of the United States Court of Federal Claims provide the Congress with the answers to two legal questions. The pertinent statutory language reads:

Sec. 823. TREATMENT OF DEPARTMENT OF DEFENSE CABLE TELEVISION FRANCHISE AGREEMENTS.

Not later than 180 days after the date of the enactment of this Act, the chief judge of the United States Court of Federal Claims shall transmit to Congress a report containing an advisory opinion on the following two questions:

(1) Is it within the power of the executive branch to treat cable television franchise agreements for the construction, installation, or capital improvement of cable television systems at military installations of the Department of Defense as contracts under part 49 of the Federal Acquisition Regulation without violating title VI of the Communications Act of 1934 (47 U.S.C. 521 et seq.)?

(2) If the answer to the question in paragraph (1) is in the affirmative, is the executive branch required by law to so treat such franchise agreements?

The court was initially concerned that the directive from Congress, requesting an advisory opinion on issues of law, might involve the speculation of the court on abstract issues of law rather than a real dispute involving real parties, a jurisdictional prerequisite which this court has required, even in congressional reference cases. However, on March 6, 1996, the court held a meeting with the only interested parties that the court to that point had been able to identify. At the meeting were counsel for Americable International, the Department of Justice, and the three armed service branches of the Department of Defense. As a result of this meeting, and after further review of the statutory language and the comments of Senator Robert C. Smith during consideration of the legislation on the Senate floor, the court concluded that the present action represented a real dispute between real parties, and that the court indeed could properly assist the Congress in answering the questions presented to the court.[1]

On March 7, 1996, the court issued a procedural order, which included a briefing schedule for all parties interested in addressing the issues presented by Congress. The order allowed any private party with an interest in the dispute to file a brief on the legal and factual issues involved. Any government department or agency with an interest in the legislation could file a response, and any private party that had filed a brief originally could file a reply. In addition, the Clerk of the Court was instructed to take "all practicable steps to notify as quickly as possible" all private parties who may have an interest in the dispute, and to notify the General Counsel of the Federal Communications Commission of this matter.[2]

As a result of this order, briefs were filed on behalf of ten private parties.[3] In re-

---

1. The court's analysis of the jurisdictional issues was detailed in a March 7, 1996 order. *See In the Matter of the Department of Defense Cable Television Franchise Agreements,* 35 Fed.Cl. 114 (1996).

2. The court notes that, unlike Executive Branch departments or independent agencies involved in rulemaking, the court rarely finds itself in the position of attempting to ascertain unidentified and unknown parties. In order to identify as many parties as possible that might have an interest in the legislation, the Clerk of the Court contacted the National Cable Television Association, the Cable Telecommunications Association, and the Small Cable Business Association, three trade associations whose members are cable system operators. The trade associations, in turn, notified their members, either by letter or publication.

3. There were seven briefs filed. Individual briefs were filed by six private parties: Americable International, CableAmerica Corporation, Multimedia Cablevision, Antilles Cable, Guam Cable, and the Cable Telecommunications Association.

sponse, the government presented a unified position in a brief filed by the United States Department of Justice.

In addition, the March 7th order also scheduled a hearing to be held May 1–3, 1996. Because of the unusual and unprecedented type of question presented to the court, the court allowed briefing by any interested party on the suggested scope of the hearing and what procedures should be used during the hearing. The court further allowed parties to suggest witnesses that the court should hear. Several of the private parties, or petitioners, offered advice on the proper scope of the hearings and suggested witnesses. The petitioners suggested witnesses who could discuss the cable industry, including cable operators, and witnesses who could testify as to the application of the Cable Act. They also suggested to the court witnesses who would testify on the economic dynamics of operating cable franchise systems and the financing of such operations. The Justice Department, representing the United States as respondent, took the view in its brief that the hearing was not necessary because the questions presented to the court were legal, and the positions of the parties could be fully detailed by brief and required no testimonial evidence.

Because this case presented unusual and novel issues—jurisdictionally, factually, and legally—the court viewed the hearing as a helpful tool in understanding the underlying issues: the financing and operation of cable systems, the relevant statutory provisions of the Title VI of the Communications Act, commonly known as the Cable Act, and similarities between cable systems and other telecommunications systems and franchises. Given these goals, the court allotted twelve hours to petitioners and twelve hours to the respondent to provide testimony. Further, because the purpose of the hearing was educational and informational, and because, un-

like a typical proceeding before this court, no party had to meet a burden of proof, the testimony would be heard in a non-adversarial fashion with no cross-examination. Indeed, the hearing would be conducted in a fashion similar to a congressional hearing or agency rulemaking proceeding. As a result, traditional rules of trial procedure would not be used: for example, the testimony could be presented through leading questions and statements. However, an opposing party could provide a list of questions that the court would ask each named witness.

Although both parties presented lists of witnesses to be heard by the court, the Justice Department elected several days before the hearing was to begin to present no witnesses, reiterating its position that testimonial evidence was not necessary and that the legal issues on which the court was to render the advisory opinion were adequately addressed in the government's brief. The court then heard testimony for approximately twelve hours presented by the petitioners on May 2 and 3, 1996.

After the hearing, the court allowed parties to submit supplemental briefs on issues raised by the testimony. On May 17, 1996, the court heard closing argument presented by counsel for petitioner Americable and counsel for the Justice Department. At the end of closing argument, the court took the questions presented by Congress under consideration.[4]

## II. BRIEF BACKGROUND

The central facts which generated the underlying dispute and the issue before the Court of Federal Claims are relatively straightforward. Consistent with the Cable Act, for many years the three branches of the military entered into franchise agreements with private cable operators to build cable systems on military installations. Un-

---

Four private parties—Coastside Cable Television, Falcon Cable TV, Lenfest Communications, and Time Warner Cable—filed a joint brief.

4. Following closing argument, the Justice Department and petitioner Americable filed motions for leave to file several supplemental documents with the court. These were, respectively: the United States' post-argument supplemental

brief; Americable's reply to the United States' supplemental brief; the United States' sur-reply brief, Americable's reply to the sur-reply brief. Because each of these briefs has aided the court in understanding the relevant legal issues, the court has admitted these supplemental briefs and considered them in formulating this opinion.

der the typical franchise agreement, the cable operator builds the cable "system"—the infrastructure designed to make all the facilities on the base cable-ready—in return for a long-term franchise to provide cable service. The franchise agreement reflects the economic dynamic of the relationship between the government and the cable operator: the cable operator builds the infrastructure at its own cost, and is given a franchise to provide cable service for a term of years in which to recoup its costs and make a reasonable return on its investment.

Since 1991, the Defense Base Closure and Realignment Commission has slated various military bases for closure. As a result of the Commission's decisions, the military began in 1993 to notify cable operators at the impacted bases of the closings and the schedule for the closings. The practical result for cable operators on impacted military bases was potentially devastating: they had already made the up-front capital expenditures to build the cable system infrastructure, but often did not have enough time to recoup their costs by selling cable services on the bases.

The Department of Defense has taken the position that cable franchise agreements are not contracts for goods or services, and as such are not procurement contracts subject to the Federal Acquisition Regulations (FAR). Rather, the government believes that these franchise agreements merely confer upon the franchisee a non-exclusive right to enter the base to construct, install, maintain, and operate the facilities and equipment necessary to provide cable services. Because the franchise agreement is thus no more than a non-exclusive easement that the government has granted to the franchisee for the designated purposes, it is the government's position that it owes no damages or costs to cable operators for unrecouped capital expenditures when bases are closed. Rather, the costs of installation and maintenance of the cable systems are to be borne solely by the cable operator. Moreover, the government contends that several provisions of the Cable Act bar the government from treating such franchise agreements as contracts subject to part 49 of the FAR.

Cable operators contend in the dispute before this court that there is nothing in the Cable Act which prevents the Department of Defense from treating such franchise agreements as contracts subject to the FAR, and that the Department of Defense is legally required to treat these franchise agreements as contracts subject to part 49 of the FAR. If these franchise agreements were to be considered contracts subject to part 49, then petitioners contend that impacted cable operators would be entitled to termination for convenience costs upon base closure.

## III.  QUESTIONS PRESENTED BY THE CONGRESS

A.  May the Department of Defense treat cable franchise agreements as contracts without violating the provisions of the Cable Act? Short Answer: Yes.

The Cable Act, which passed the Congress as the Communications Policy Act of 1984, had as its purpose the establishment of a national policy for the regulation of cable systems, and also was designed to establish guidelines for the exercise of federal, state, and local authority with respect to the regulation of cable systems. 47 U.S.C. § 521. While the Act created and established parameters for the regulation of cable systems at the federal level, there is apparently no dispute among the petitioners and respondent in this matter that the Cable Act did not at the same time preempt local rules and regulations that were not inconsistent with the Act. Petitioners before this court assert that no provision of the Cable Act is inconsistent with, and would be violated by, treating the franchise agreements at issue as contracts subject to part 49. The government argues that two provisions of the Cable Act would be violated if the government were to treat the franchise agreements as contracts subject to part 49. The first, Section 635A of the Cable Act, codified at 47 U.S.C. § 555a, establishes a limitation on the liability of franchising authorities. The section, entitled "Limitation of Franchise Authority Liability," states:

(a) Suits for Damages Prohibited—In any court proceeding pending on or initiated

after October 5, 1992, involving any claim against a franchising authority or other governmental entity, or any official, member, employee, or agent of such authority or entity, arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise, any relief, to the extent such relief is required by any other provision of Federal, State, or local law, shall be limited to injunctive relief and declaratory relief.

47 U.S.C. § 555a. The government argues that, because the monetary obligations for termination for convenience imposed by part 49 could be enforced by an award of monetary relief only, such a remedy would clearly violate the requirement of section 635A that all suits be limited to injunctive and declaratory relief for disputes arising from a regulation of cable service.

The court believes that part 49 remedies are outside the scope of section 635A, and hence would not violate this provision of the Cable Act. Section 635 is designed to limit monetary liability for, among other things, disputes "arising from the regulation of cable service." It strains credulity to argue that the closure of a military base—in essence, the disappearance of any franchising authority whatsoever—creates a dispute "arising from the regulation of cable service." Rather, as petitioner Americable points out, in such a situation there is no "cable service" to "regulate." Moreover, the other situations where actions requesting monetary liability are not permitted—actions respecting the "grant, renewal, transfer, or amendment of a franchise"—are similarly not implicated when a base closes and a cable operator is attempting to recover its unrecouped capital investment.

Further, section 635A does not eliminate remedies, but merely limits them in certain instances to injunctive and declaratory relief. This appears consistent with the goal of this provision, which on its face appears to be to limit the exposure of municipal authorities to damage awards from disappointed bidders or groups attempting to gain leverage over the award process, while still affording aggrieved cable operators an opportunity to obtain a complete remedy. The provision thus provides for equitable relief only, for policy purposes, when such relief is sufficient to provide an aggrieved cable operator relief. However, in the case of a cable operator on a closing military base, there is no possible injunctive relief available to the cable operator: the courts constitutionally cannot enjoin the base from closing.

This strongly suggests that section 635A was drafted with municipal and city authorities in mind, and with no consideration whatsoever of the unique attributes of a franchise agreement for cable systems on military installations, an admittedly tiny subset of all cable systems. The fact that the military installations were clearly never given consideration when the Congress was considering the Cable Act further buttresses the court's position that treating franchise agreements as contracts subject to part 49 is beyond the scope of the restriction embodied in section 635A, and hence would not be violative of this provision of the Cable Act.

The government also contends that another provision of the Cable Act, section 621(a)(2), codified at 47 U.S.C. § 541(a)(2), prohibits the Department of Defense from treating cable franchise agreements as contracts. The section states in pertinent part:

Any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is within the area to be served by the cable system and which have been dedicated for compatible uses, except that in using such easements the cable operator shall ensure—

. . . .

(B) that the cost of installation, construction, operation, or removal of such facilities be borne by the cable operator or subscriber, or a combination of both. . . .

47 U.S.C. § 541(a)(2). The government argues that the plain language of this provision clearly prohibits either the franchising authority or the land or easement owner from bearing any of the costs of installation, construction, operation or removal of the cable system facilities. Because with respect to Department of Defense installations the gov-

ernment is the owner, franchising authority and easement grantor, the government contends it is prohibited from paying any of these costs under this provision. Under part 49 of the FAR, the government believes that DOD could be required to pay a portion of the costs for installation, construction, operation and removal of cable system facilities, and the government argues that application of part 49 would hence be violative of section 621(a)(2).

■ The court believes that application of part 49 would not violate section 621(a)(2). The provision is clearly designed to ensure access by cable operators to public rights-of-way and easements for purposes of building and maintaining cable systems, while at the same time ensuring that the owner of the property on which a right-of-way or easement sits does not have to pay for such installation and maintenance. The provision, however, says nothing about whether the franchisor, as opposed to the owner, can be liable for costs when it terminates a cable system. Again, this provision is directed to the problems of installing and maintaining municipal cable systems, and their interaction with the operations of an ongoing town or city.

Thus, the government, just like any other owner of property, cannot be required to pay for "installation, construction, operation and removal." However, this provision is not relevant as to what liability, if any, the government might have as franchisor for termination of a cable system before a cable operator is able to recoup its costs. Indeed, other provisions expressly provide for a franchisor to pay for costs in at least two instances: upon non-renewal and transfer (47 U.S.C. § 547(a)), and upon for cause terminations (47 U.S.C. § 547(b)).

It appears clear that the provision is not designed to foreclose remuneration for any costs by a franchisor, but is a narrowly tailored provision designed to ensure cable operators receive access to easements and rights-of-way on private property, while protecting the owners of the property from having to absorb the costs of such use. The fact that on military bases the government is both franchisor and owner of the property

does not convert this narrow provision into an expansive one prohibiting the government from ever paying termination costs.

Having disposed of the two arguments made by the government, the court is able to find no other legal impediments in the Cable Act for treating Department of Defense cable franchise agreements as contracts under the FAR. Although there are no impediments, this of course does not answer the question of whether the government can or must treat cable franchise agreements as contracts subject to part 49 of the FAR. THE COURT THUS CONCLUDES that there is no legal impediment in the Cable Act for treatment of cable franchise agreements as contracts subject to the FAR.

B. May the government treat cable franchise agreements as contracts subject to the FAR, and if so, is the government required by law to do so? Short answer: Yes and Yes.

■ Petitioners and respondent have generally taken polar positions. Petitioners argue that the Cable Act and federal acquisition law require that these franchise agreements be treated as contracts subject to the FAR. Respondent argues that the government affirmatively is prohibited from applying FAR termination for convenience provisions to these franchise agreements.

*Petitioners' argument* that these agreements must be treated as contracts subject to the FAR goes as follows: The Cable Act provides that any entity empowered by Federal, State, or local law to grant a franchise may be a franchising authority; since the Cable Act does not itself empower entities to be franchise authorities, the Department of Defense must derive its authority from, as petitioner Americable calls them, "organic government contracting statutes," such as the Competition in Contracting Act (CICA), whose implementing regulations are the FAR; because the Cable Act does not address the termination for convenience by the government, the organic statute, and FAR's mandatory termination for convenience provisions, govern; franchise agreements are contracts because they either directly or in connection with "follow-on" services obligate

funds for the acquisition of property or services, and resemble other telecommunications contracts subject to the FAR. Petitioners' conclusion then is that DOD is required to treat these franchise agreements as contracts and the government is thus required to pay termination for convenience costs.

*The government's argument* goes as follows: the government derives its authority to enter into franchise agreements from federal rights-of-way statutes and from the inherent authority of the federal government to control access to its property, not from CICA and the FAR, which are procedural in nature; although it believes that the franchise agreements are not contracts, the FAR only governs contractual acquisitions by the government; acquisition is defined as "the acquiring by contract with appropriated funds of supplies or services"; since under the franchise agreements the government neither obligates appropriated funds nor acquires goods or services under the franchise agreement, then part 49 of the FAR does not apply, even if the agreement may in some sense be considered a contract, and impacted cable operators are hence not entitled to termination for convenience costs under part 49.

As a preliminary matter, the court notes that the argument over the derivation of the authority for the military to act as a franchisor under the Cable Act is not particularly relevant to the ultimate question the court needs to resolve: whether these franchise agreements are subject to part 49 of the FAR. The government is correct that the federal rights-of-way statutes, 16 U.S.C. § 420 and 43 U.S.C. § 961, and the government's traditional prerogative to control access to its own property, are the sources of at least a part of the authority needed to enter into franchise agreements. To the extent that franchise agreements do indeed provide rights-of-way to construct and maintain the cable system, the rights-of-way statutes provide authority, but *only* as to that portion of the franchise agreements dealing with rights-of-way. Clearly, however, these franchise agreements at issue are much more than mere easements: they create reciprocal rights and responsibilities and include en-forceable terms and conditions—for example, a term requiring the cable operator carry a "mission essential" station on the system—that have nothing to do with easements or rights-of-way.

■ The question then is where does the government derive its authority to enter into such agreements? Petitioner Americable states that the authority is derived from "organic" government statutes, such as CICA and its implementing regulations, the FAR. These are procedural and not authorizing in nature: they provide the statutory and regulatory framework to guide the military in its contracting. Rather, the "organic" authority allowing the government to enter into franchise agreements—that is, enter into contractual relationships—is that power traditionally vested in the sovereign to contract for its benefit. *United States v. Winstar Corp.,* — U.S. —, — – —, 116 S.Ct. 2432, 2459–60, 135 L.Ed.2d 964 (1996) (plurality opinion) (citing *United States v. Bekins,* 304 U.S. 27, 51–52, 58 S.Ct. 811, 815–16, 82 L.Ed. 1137 (1938)). Thus, while CICA and the FAR may ultimately be implicated, if the court determines that these franchise agreements are contracts for the acquisition of property or services, they do not in and of themselves confer franchising authority on the Department of Defense.

As indicated, however, the question of authority is not particularly material. It is material only insofar as petitioners argue that CICA and the FAR provide the franchise authority for DOD. Since CICA and the FAR are procedural and not authorizing in nature, it is hence not automatic that these franchise agreements are subject to the FAR. Rather, the inverse may instead be true: FAR requirements need to be met if the franchise agreements are contracts.

Thus the court must address just one central question: Are franchise agreements for installation and maintenance of cable systems contracts covered by part 49 of the FAR? Both petitioners and respondent agree that part 49 applies to contracts in which the government acquires supplies or services with appropriated funds. Both sides differ fundamentally, however, in what they believe the scope of these franchise agreements are.

*The government's position* is that, taken alone, a cable franchise agreement does not require the government to acquire any supplies or services, and obligates no appropriated funds. It merely confers upon the cable operator as franchisee a non-exclusive right to enter the base for the limited purposes of constructing, installing and operating a cable system. The government distinguishes the franchise agreement from subsequent contracts entered into between the cable operator and subscribers for cable service. To the extent that the government enters into contracts to subscribe to actual cable services, the government admits that those contracts would be acquisition contracts and consequently the government would be liable for termination costs for the subscription contracts. These contacts, according to the government, are separate and distinct from the franchise agreement, which itself creates no obligation on the government to purchase services with appropriated funds.

*Petitioners argue* that it is impossible to separate the franchise agreement from the follow-on services ultimately purchased by the military. Viewed together, the entire contract is an acquisition by the military of services obligating appropriated funds, and the cable operator would be entitled to termination for convenience damages for its unrecovered and unamortized capital costs. In addition, petitioners argue that even if one could somehow separate the franchise agreement from the subsequent service contracts, the franchise agreement standing alone obligates appropriated funds and hence brings the agreement under part 49 of the FAR.

Although the government's argument offers a surface plausibility, it must be rejected. As a preliminary matter, the government's argument that the franchise agreement is nothing more than a non-exclusive right of entry to construct, install, and maintain a cable system simply does not reflect the nature of the franchise agreement standing alone. The franchise agreement does contain such a right of entry, but this is only a portion of its scope. The agreement also memorializes the corresponding rights of the parties, and the obligations of the cable operator in actually operating the system. This goes far beyond a mere right-of-way.

The court believes that the only logical way, consistent with the facts, to read the franchise agreement is together with the follow-on subscription agreements. The fact is that in every instance the government purchased a service through the franchise. That service is the ability to access and obtain cable anywhere on the base for any purpose. Although this point was contested by the petitioners and respondent, it does not matter what proportion of the cable subscriptions are ultimately purchased by the service branches and what proportion are purchased by soldiers in a private capacity, because in both instances the military is contracting to provide a service under the terms and conditions it deems necessary in order to satisfy many different needs on a given military base. Obviously, when the military purchases cable service directly it is by definition purchasing a service for government use. However, the franchise agreement also ensures access to service for all military personnel living in base housing, and this helps the military meet an important goal: providing suitable and attractive living arrangements and amenities for personnel living on-base. Thus this contract provides an important ancillary service for the military by helping the military fulfill their mission to provide good working and living conditions for base personnel. The military benefits, both directly and indirectly, from the franchise agreement.

The franchise agreement can only be understood in an economically rational way if one includes the natural and expected follow-on services as part of the bargain. Seen in this light, a military base enters into a franchise agreement for the purpose of purchasing a service—the ability to have access to cable television for its direct use and the use of the base population. In consideration the cable operator is granted a specific term of years—embodied in the contract and enforceable by the cable operator—in which to make a return on its capital investment by selling subscriptions. It is true that the military is not obligated to purchase cable service under the terms of these franchise agreements, but

the reality is that both the cable operator and the base know that sales to the base of cable service will be a natural consequence of the franchise agreement, and are expected to occur under the agreement.

Indeed, it is precisely the fact that these franchise agreements are granted for a term of years that indicates that both parties to such contracts understand the scope of the agreements includes follow-on services. The government's position would be far more plausible if it had merely provided a right-of-way, revocable at the government's option, for a cable operator to build, construct, and install a cable system. Of course, a rational cable operator would never enter into such an agreement because it could have no guarantee that its investment would be protected. The consideration a cable operator receives in the franchise agreement is the term of years, which gives the cable operator the opportunity to recoup its investment and make a return on that investment.

It is also instructive to see if the franchise agreement can be viewed rationally under the government's interpretation. Under the government's theory, cable operators are permitted to build and maintain a cable system at the cable operator's cost, while at the same time the contractor has no idea whether the term of years needed to recover its investment will take place. Moreover, the government at any time can close the base and eliminate the opportunity for the cable operator to recoup its costs. It appears clear to the court that no rational actor would agree to such terms; it would face unquantifiable risks and uncompensable damages. This approach would turn a cable franchise at a military base into a pure gamble.

The government argues that the risk of base closure was a legitimate business risk that cable operators assumed when entering into these agreements. Aside from the fact that it was very unlikely that base closure was ever contemplated by either the government or cable operators as a real possibility when these agreements were executed, this cannot be considered a legitimate business risk. No person would argue that cable operators are guaranteed a profit; they are susceptible to the traditional risks all businesses face. Things such as changing costs, the ability to attract customers, and the estimates and projections on which bids are made all are business variables that are inherent to any business venture. The closure of the military base, however, is a unilateral act by a party to the bargain that deprives cable operators not only of any opportunity to make a profit but of any opportunity to recover fixed and sunk costs. Such action by one party to a bargain that can directly damage the other cannot be considered to fall under the rubric of legitimate business risk. Further, such an interpretation is violative of the spirit of the Cable Act itself, which has as a purpose protecting cable operators from arbitrary and damaging actions that prevent the operator from recovering its costs.

The only rational explanation as to the nature and scope of these franchise agreements is that they are contracts that have to be understood in terms of incorporation of the follow-on services which are natural and expected consequences. Indeed, they form the very purpose for entering into a franchise agreement from the cable operator's perspective. Adoption of the government's strained and hyper-literal interpretation of the franchise agreement would contravene the true scope of the contract to which a cable operator and a service branch were parties. The Air Force understood this, unlike DOD or the other services. *See* Air Force Reg. 70–3, ¶ 19.b (Oct. 1988). Thus, the court finds that the franchise agreements, read as contracts in their entirety, are military acquisitions of services which obligate appropriated funds. Thus, impacted cable operators are entitled as a matter of law to termination for convenience costs for the unamortized and unreturned portion of their capital investments.

## IV.  EQUITY

During consideration of Section 823 of the 1996 National Defense Authorization Act on the Senate floor, Senator Robert Smith, Chairman of the Senate Armed Services Subcommittee on Acquisition and Technology, clarified that it was the intention of the Armed Services Committee that the court

was to consider "equity" in determining whether the Department of Defense is required to treat the franchise agreements as contracts. 142 Cong.Rec. S457 (daily ed. Jan. 26, 1996) (statement of Senator Smith). The court also realizes that the Congress, in asking for the court to review the equitable considerations, is also asking the court to perform a traditional function that courts historically undertake: the exercise of judgment. For that reason, and in an effort to aid the Congress in resolving this dispute, the court will review the equitable considerations.

From the court's perspective, it appears clear that petitioners—at least the ones who appeared either in person or in writing before this court—have a strong equitable claim to compensation regardless of the status of the law. There is no dispute that the economic dynamics of the cable business are such that the cable operator needs the term of years under the franchise agreement to recoup its capital investment and make a return on that investment. Moreover, it appears evident that the possibility of major base closure was simply not seriously considered by either franchisors or franchisees as defense spending continued to increase prior to the end of the Cold War. There was simply no consideration that the military would shrink rapidly, necessitating the closure of bases while cable operators were still trying to recoup their investments. Further, the closing of the bases, which effectively denied the cable operators on impacted bases the opportunity to recoup their investments, was, of course, without any fault by the cable operators nor within their control. Closure means the subscriber population literally disappears, leaving the cable operator with a ghost system.

Moreover, the Cable Act clearly reflects a public policy designed to protect cable operators from arbitrary and unfair actions by franchisors unrelated to their provision of services. See, e.g. 47 U.S.C. § 521(5). The Cable Act renewal provisions are designed to protect cable operators who have complied with statutory and regulatory conditions. While the instant situation is not on point with any of the provisions designed to pro-

tect cable operators, it is analogous. Cable operators who operated on now closed bases face serious losses as a result of government action. The fact that this was not explicitly addressed in the Cable Act is likely a reflection of the fact that a very small proportion of U.S. cable franchises exist on military bases. Notwithstanding the small number, they represent a unique problem that doesn't affect operators who have agreements with municipal franchising authorities: base closure eliminates completely the source (the base population) that the cable operator depends upon to recover its capital expenditure. An equitable solution, allowing impacted operators to recover their capital, comports with the clear purpose of the act.

The court is thus not surprised that this dispute ultimately found its way to the legislature. In this case, the legal questions are novel, but the equitable considerations weigh strongly in favor of the impacted cable operators. The cable operators petitioned their elected representatives to craft an equitable resolution to a problem unanticipated by the parties and not contemplated by the Cable Act, but which as a result of government action has caused substantial hardship to impacted cable operators. The court hopes that the Congress finds this analysis a useful supplement to its legal analysis.

## V. SETTLEMENT

The various cable franchise terminations, as a result of base closures, may give rise to significant additional litigation in this court and the district courts. A legislative solution of compensation for all such terminations may be appropriate in that it would save the government and the various actual and potential plaintiffs significant litigation costs. It is also a solution more consistent with fair public policy and the need to reduce litigation in the American legal system.

Therefore, the court goes beyond its requested Advisory Opinion and makes a settlement suggestion to the Congress. Based upon the testimony presented at the hearing the court found that 10 years was a fair period for the amortization of cable system capital costs. Further, the amount of revenue the cable operator could expect to use to

amortize its investment is about 50% of the gross revenue received by the system. (The 50% figure is a very rough estimate.)

Thus, a formula could be worked out for compensating systems at closed bases like the following:

1. Number of cable subscribers on average, excluding start-up 18 months, and excluding any decline in the year prior to closure or significant downsizing.

2. Multiply this number by 50% of the annual gross subscription revenue.

3. Multiply the resulting number by the remaining franchise years or months of the original ten year period. Where significant capital upgrades were built, their time of construction would provide the starting point for figuring the 10–year period.

4. Finally, for each year left after closure a 10% discount should be provided per year to account for the present value of the system at the time of closure.

5. This final value should receive compound interest from the time of closure to put the cable operator in the same position it would have been in if it had been compensated on the date of closure.[5]

## CONCLUSION

The court finds that the Cable Act does not prohibit the Department of Defense from treating cable television franchise agreements as contracts subject to part 49 of the FAR. In addition, the court finds that, as a matter of law, cable franchise agreements are contracts subject to part 49 of the FAR. Further, the court also finds that equitable considerations weigh strongly in favor of the cable operators. Because of the complexity of the law in this area, the Congress should consider a legislative remedy which would entitle impacted cable operators to recovery of unamortized costs figured in a manner substantially similar to that used for termi-

nation for convenience costs in part 49 of the FAR or some other fair system as suggested.

The Clerk of the Court is directed to send this report to the appropriate officers and members of the Congress.

**IT IS SO ORDERED.**

---

**5.** The court offers a very rough example of how this formula would work in practice. This example is premised on a cable system at a base closed after the 6th year with 10,000 subscribers, on average, who each paid $200 per year.

10,000 times $200 times 50% = $1,000,000.
4 years remaining times $1,000,000 = $4,000,000. This figure would then be discounted at

a 10% rate per year for each year over the 4 year remaining life of the franchise. Thus, the final award would be roughly $3.4 million. With existing computer programs this should more fairly be done on a monthly basis, but this formula is only a very rough illustration.